## SUPREME COURT.

CORNELIUS V. S. ROOSEVELT agt. J. B. VARNUM, SIMEON DRA-
PER, ROBERT B. COLEMAN and THE MAYOR, &c., of NEW-
YORK.

A person being a resident and tax-payer of the city of New-York, owning real
and personal estate therein, may file his complaint for himself and all others
interested, in an action against the *corporation and others* combining with it,
for the purpose of preventing their disposition of the property of the city con-
trary to the charter of the city, or the statutes of the state, or in breach of the
duties of the corporation as *quasi trustees*, when this unlawful disposition will
cause a loss to the city.

The same principle will allow also an action, after the design of the defendants
is partly accomplished, even by the execution of a deed, for the purpose of
preventing any title being set up under that deed, and to cause the defendants
to do such other acts as may be necessary to redress a wrong done, or about
to be done, to the city.

A governor of the almshouse of the city of New-York cannot purchase for him-
self alone, or for himself and others, real estate belonging to the corporation
of the city. A deed given upon such a purchase cannot be sustained.

The law which declares that no head of department, or other officer of the cor-
poration, shall be directly or indirectly interested in the purchase of any real
estate, or other property belonging to the corporation, includes the ten govern-
ors of the almshouse—they are the chief officers of the executive department
of the corporation, known as the Almshouse Department.

*New-York Special Term, March,* 1855.

THIS was an action to set aside sale of real estate, made by
the common council of New-York.

S. W. ROOSEVELT, *for plaintiff.*
WM. M. EVARTS, *for defendants.*

MITCHELL, Justice. The complaint filed 25th January, 1853,
states, in effect, although perhaps in terms which might require
more definiteness, that the plaintiff is a resident and tax-payer
of the city of New-York, owning real and personal estate situ-
ate therein, and that he files his complaint for himself and all

others interested.    This entitles him, according to the decisions of the supreme court in this district, to an action (against the *corporation*, and others combining with it,) for the purpose of preventing their disposition of the property of the city contrary to the charter of the city or the statutes of the state, or in breach of the duties of the corporation as *quasi trustees*, when this unlawful disposition will cause a loss to the city.    The same principle will allow, also, an action, after the design of the defendants is partly accomplished, even by the execution of a deed, for the purpose of preventing any title being set up under that deed, and to cause the defendants to do such other acts as may be necessary to redress a wrong done, or about to be done, to the city.    It is unnecessary here to vindicate that jurisdiction—in this court it now rests on authority; and those who observe the limits contained in the rule, will find little cause to apprehend any evil from it.

The complaint also shows, that the corporation, on the 20th of December, 1852, passed a resolution, "that the land to *be made* on the North River, with the bulkhead, between Gansevoort and Twelfth streets, be sold to D. R. Martin, or any other applicant for the purchase thereof; and that it be referred to the commissioners of the sinking fund to fix the terms and price—the proceeds of which to be paid into the sinking fund for the redemption of the city debt;" that a majority of the commissioners agreed to sell the property on certain terms, part of which were, that 25 per cent. should be paid on delivery of the deed, and the rest to remain on bond and mortgage for five years, with interest at 6 per cent. per annum; and that the majority rejected a proposal to sell or offer the property at auction, and fixed the price at $160,000, and authorized a deed to be executed to Reuben Lovejoy for the same at that price; that thereupon the mayor and the clerk of the common council, on the 27th of December, 1852, affixed the seal of the corporation to a deed for the premises at the above price to J. B. Varnum, who executed a mortgage back for $120,000; and, on the 31st of the same month, executed a deed to R. B. Coleman for an undivided half of the premises, subject to half

Roosevelt agt. Varnum and others.

of the mortgage; that both Varnum and Coleman were acquainted with all the facts stated in the complaint; and that Lovejoy was not, in fact, personally interested in the purchase, but that the defendant Draper was one of the persons actually influential and actually interested therein, and in the profits to be derived therefrom, and that he is charged in the books of the comptroller with the property, as if the sale were made directly to him; and that he, in fact, paid part of the purchase money, and is now, directly or indirectly, interested in the property, or the profits thereof, and is credited on the books of the late comptroller with the sum of $40,000, as a payment of 25 per cent. on the purchase; and that he was, at that time, one of the governors of the almshouse.

The facts intended to be stated are, that Mr. Draper, while he was a governor of the almshouse, purchased for himself alone, or for himself and others, a large amount, in value, of the real estate belonging to the corporation, and that all the other defendants knew these facts; and the question argued, among others, was, is this lawful, and can the deed be sustained, or must it be vacated?

The statutes relating to this question are contained in chapters 187 and 246 of the laws of 1849, as amended in chapter 543 of the laws of 1851.

The first is the act to amend the charter of the city, passed April 2, 1849, but to take effect on June 1, 1849. (*p.* 278.)

The second is the act to provide for the government of the "*Department* of Alms and Penitentiary" in the city and county of New-York, passed April 6, 1849, and took effect on May 8, of that year. (*p.* 367; *see, also, p.* 570.)

Section 19, of chapter 187 of the act of 1849, declares that, "*No member of the common council, head of department,* chief of bureau, deputy thereof, or clerk therein, or *other officer of the corporation,* shall be directly or indirectly interested in any contract, work or business, or the sale of any article, the expense, price or consideration of which is paid from the city treasury, or by any assessment levied by any act or ordinance of the common council, *nor in the purchase of any real estate,* or other *property* be-

longing to *the corporation*, or which shall be sold for taxes or assessments."

Section 17, of the same act, declares that, "There shall be an executive department, known as the 'Almshouse Department,' which shall have cognizance of all matters relating to the almshouse and prisons of said *city;* the *chief officers* shall be called 'Governors of the Almshouse.' They shall consist of the numbers, derive and hold their offices, and be charged with the duties and responsibilities, as prescribed by the act entitled 'An Act to Provide for the Government of the Almshouse and Penitentiary in the City and County of New-York.' "

The act thus last referred to is the act contained in chapter 246 of the laws of 1849, passed April 6, of that year—it is thus recognized in the act amending the charter before it was enacted, and its provisions were before the legislature at the time of passing the last act, so that the first act is to be interpreted as to anything in it relating to the heads of the department for the almshouse and penitentiary, as if the last act were then actually in force.

Section 9 of chapter 187, declares that "the *executive* power of the *corporation* shall be vested in the mayor, the *heads of departments*, and such other executive officers as shall be, from time to time, created by law."

Section 1, is that "the legislative power of *the corporation* shall continue to be vested in a board of aldermen and a board of assistant aldermen," &c.

It was argued for the defendants, that "the Ten Governors" were not officers of the *corporation*; that the great object of the act creating them was, to make them a separate body, and entirely independent of the corporation; and with this view they were not to be appointed by, or removed at the will of, the corporation. If impeached, they were to be impeached, not before the common council, but before the supreme court; and that they could require directly from the supervisors whatever sums they should find necessary for their department, without any action of the common council on the subject; and that

therefore § 19, above quoted, did not apply to them, but only to officers who might be considered as acting under the common council, and subject to their control: and in furtherance of this distinction, it was argued that the ten governors received no compensation for their services, but the other officers were paid by the city. To meet this argument, it was necessary to refer to the above sections at large. They show that when "the corporation" is spoken of, it is that creation of the charter which includes the whole body corporate, and not the mere legislative body, or the common council.

Thus "the legislative power *of the corporation*" is spoken of and is vested in the aldermen and assistants:—(§ 1.) "The executive power of the *corporation*" is spoken of, and is vested in the mayor, the *heads of departments*, and such other executive officers as shall be, from time to time, created by law. (§ 9.)

The following sections point out the duties of the different departments, thus described by § 9, as having the executive power of the *corporation*—and thus being departments or officers of the *corporation*. Among these sections, § 17 declares, that there *shall* be an executive department, known as the "Almshouse Department," and speaks of its chief officers, and thus includes it among the departments of the corporation, and its chief officers, as officers of the corporation.

Section 19 follows, and declares that no *head of department*, or other officer of the corporation, shall be directly or indirectly interested in the purchase of any real estate, or other property, belonging to the corporation.

The previous 17th section had constituted the ten governors a department of the corporation, and declared them "the *chief officers* thereof." The chief officers of a department are the head of that department. The ten governors are, therefore, within the strict literal meaning of the 19th section: they are also "officers of the corporation," although not under the control of the common council: and so again within the same section. If they are not officers of the corporation, it would be difficult to show that the mayor was such an officer; and then a section drawn with great care, and with a wide enumeration of officers,

would omit some of the most important officers of the city, and who would, from their position, have the most influence with their fellow officers, having the control of the city property.

If we look to the spirit of the law, there are as strong reasons why it should apply to the ten governors as to any other department. These officers have the power to demand of the supervisors whatever amount of money they may require for the relief and support of the poor. (§ 12 *of Chap.* 246.) This gives them a great money power—the disbursement of large funds, and the making of contracts of large amounts, which must be of great profit to some, if not to many. They thus have the means (if dishonestly disposed) of requiting a favor in the sale of lands, or in the giving of a contract, to their friends, by giving contracts in return to those who favor them—for this can be done even when the contract is given to the lowest bidder. They also, from their position, must become intimate with the other members of the corporation : they annually report their proceedings to the common council, and that body, by committees, is, at least twice a year, to visit and inspect this department, and all the institutions under its care : and in the discharge of their duties, they exercise the privilege of inviting that body to enjoy the hospitalities furnished by them. Does not their situation give them much greater opportunities of influence than any deputy or clerk in the police department, or in the department of repairs and supplies, or of streets and lamps, or in the law department, or any subordinate officer of the corporation could have? All these are clearly excluded, and why should not the ten governors, who are within the letter of the law, and have more means of influence?

It was said, the ten governors receive no compensation, and the others are paid. This is true : and that very circumstance would give them an influence, when applying to be allowed to make a purchase that others could not enjoy. It would naturally be said, these are honorable men, uninfluenced by selfish considerations, who give their time and their labor to the public without any compensation : they would be above any attempt to purchase the public property below its real value, and we

may therefore safely sell to them, without loss to the public. And if the proposed purchaser were of a frank, open and generous disposition, full of public spirit, and above a mean and selfish act, his high character would strengthen this conclusion. Then it might well happen, as in this case, that three out of five of those who had the sale in charge, would reject a resolution to sell the land at auction, or to fix a maximum price for it at private sale, or to give it to the one offering, at private biddings, the highest price above a minimum sum; and that a sale of so valuable a piece of property should be authorized and completed between the 22d and 27th days of the same month, just as the then existing common council were about yielding up their power.

In this case, the officer who is said to be the purchaser, sustains a high character, and so deservedly so, that if he had been advised that his purchase was of even doubtful legality, he would probably have abandoned it at once, if he could do so without appearing to admit an imputation on his fairness.

It is said, next, that the section referred to makes void only the contract for the purchase, and that the contract, being executed by the delivery of the deed, cannot be set aside. There may be cases in contracts between individuals where this rule would be properly applied. They might have power to rescind a contract, and lose that power if they chose to execute the contract—that might be deemed a waiver of their defence to the contract. But this law is passed to protect the public from the acts of its own officers. The officers—(the law-makers feared)—might do acts which would injure the public. No act, therefore, of the officers can take away the original defect in the title attempted to be passed. Neither they nor the common council—(much less the mayor and clerk)—have power to make an illegal contract valid by executing it. If they could, they have only to make a preliminary contract, and then make a sale, and the law would become a nullity. But the section is not confined to contracts; it declares that these officers shall not be interested, directly or indirectly, in any contract, &c., "nor in the *purchase* of any *real* estate, or other property, be-

longing to the corporation." The giving of the deed, and the paying of the purchase money, are the material parts of the purchase—and are the very parts which constitute the evil which the act seeks to prevent or avoid.

The complaint shows that the other two individual defendants, who held no public office, knew all the facts stated in the complaint, when they purchased: they can, therefore, have no better title than the one who is one of the ten governors.

If this view of the case be correct, it is unnecessary to examine other objections raised to the purchase.

The individual defendants should reconvey to the corporation by a title free from all incumbrances, and with covenants against their own acts, and be repaid the amounts paid by them, with interest, and the mortgage be satisfied—unless the corporation should elect to have the property sold at auction, and in a manner conformably to law, in which case the defendants would be bound by their purchase, unless the property should bring more than $160,000, and the interest thereon.

The costs of the plaintiff should be paid by the individual defendants; the corporation should bear their own costs.